J-S56016-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: A.O. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: LACKAWANNA COUNTY | : | |
| DEPARTMENT OF HUMAN SERVICES, | : | |
| OFFICE OF YOUTH & FAMILY | : | |
| SERVICES | : | |
| | : | |
| | : | No. 502 MDA 2016 |

Appeal from the Order Entered March 7, 2016
In the Court of Common Pleas of Lackawanna County
Orphans' Court at No(s):  A-2-2016

BEFORE:  BENDER, P.J.E., PANELLA, J., and STEVENS*, P.J.E.

MEMORANDUM BY PANELLA, J.                    **FILED SEPTEMBER 09, 2016**

The Lackawanna County Department of Human Services, Office of Youth and Family Services ("the Agency"), appeals from the March 7, 2016 order denying its petition for the involuntary termination of parental rights of L.O. ("Mother"), with respect to her daughter, A.O., born in January 2010. We reverse and remand.[1]

_____

* Former Justice specially assigned to the Superior Court.

[1] We observe that the child's guardian ad litem, at the conclusion of the testimonial evidence, recommended that the orphans' court involuntarily terminate Mother's parental rights. **See** N.T., Hearing, 1/26/16, at 72.

The Agency filed the subject petition on January 7, 2016, wherein it requested the involuntary termination of Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (8), and (b). On that same date, the Agency filed a petition to confirm consent to adoption with respect to J.S. ("Father"). A hearing on the petitions occurred on January 26, 2016, during which the Agency presented the testimony of Nicholas Robinson, an Agency caseworker; Michelle Mancuso, a detective with the Lackawanna County District Attorney's Office; and Nikki Ganczarski, an Agency caseworker. Mother attended the hearing, but she did not present any evidence. Father did not attend the hearing, but he was represented by counsel who was excused from the proceedings by the orphans' court after it ruled, on the record and in open court, to confirm Father's consent to the adoption of A.O. *See* N.T., Hearing, 1/26/16, at 15-16.

The record reveals that A.O. has been adjudicated dependent on three separate occasions in her six years of life due to Mother's illegal drug use; that is, on January 21, 2011, which was discharged on September 29, 2011; on November 10, 2011, which was discharged on July 8, 2013; and most recently, on June 12, 2014. She had been in placement for twenty consecutive months by the time of the subject proceedings. *See* N.T., 1/26/16, at 17. In total, A.O. had been in placement for 37 months—half of her life. *See id*. at 18.

Detective Mancuso testified with respect to the incident that occurred on May 31, 2014, that resulted in A.O.'s most recent placement, and in Mother's incarceration until November 18, 2015. *See id*. at 19. The detective was part of a team on that date that executed a search warrant at Mother's residence for drug paraphernalia. *See id*. at 44. Mother and A.O. were not home when the search team arrived. *See id*. at 45. When she did arrive home, Detective Mancuso testified that, "Mother took off in her vehicle." *Id*. Detective Mancuso and her colleague pursued Mother in a car that had emergency lights and sirens activated. *See id*. at 46. She testified that Mother drove erratically, and she went through three stop signs until she came to a stop. *See id*. Detective Mancuso testified that Mother "refused to get out of the car with our commands. At that point, I did see the child in the back seat; a young child, unrestrained." *Id*. She explained that the child was not in a safety seat or restrained by a seatbelt. *See id*. at 46-47. Detective Mancuso testified that her colleague "tased" Mother through the open door of her vehicle, and they then took Mother into custody. *Id*. at 47. She testified that her colleague retrieved "some heroin out of her, I think it was [in] her pocketbook, or maybe her pants[.]" *Id*. at 48. Detective Mancuso testified that she subsequently retrieved from Mother "approximately 210 bags of heroin, from her pants. . . ." *Id*. at 49. Thereafter, Detective Mancuso placed A.O. into the custody of the Agency. *See id*. at 50.

At the conclusion of the evidence, the orphans' court ruled on the record in open court to deny the Agency's petition for the involuntary termination of Mother's parental rights. *See id*. at 72-73. In addition, upon request by the Agency's counsel, the orphans' court held in abeyance its ruling that granted the Agency's petition to confirm Father's consent to adoption. *See id*. at 76-77.

On February 24, 2016, the court issued a written decision and order regarding the Agency's petitions, which was entered on the orphans' court's docket on March 7, 2016. On March 29, 2016, the Agency timely filed a notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). The orphans' court then filed a Rule 1925(a) opinion.

The Agency presents the following issues for our review:

I. Whether the orphans[′] court erred by not considering the ASFA guidelines, the previous court orders and that the child has been in placement for thirty-seven months, more than half her life and denies the child permanency, committing an error of law?

II. Whether the orphans[′] court erred as a matter of law by not doing an analysis of the best interests of the child?

III. Whether the decision of the orphans[′] court is against the weight of the evidence in that Mother did not testify nor had any other witnesses on her behalf?

IV. Whether the orphans[′] court erred by not stating, in the alternative, how much time Mother was to receive in order to attempt to complete the requirements of the permanency plan, an abuse of discretion?

V. Whether the orphans[']court erred and abused its discretion by not considering that the Mother had repeated periods of incarceration in relapse, never making progress toward reunification?

VI. Whether the orphans[']court erred by finding that Mother had not had sufficient time to complete reunification, which is contrary to the evidence presented?

VII. Whether the orphans[']court erred and committed an abuse of discretion by misapplying the cases cited in its decision?

Mother's Brief at 6.

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act ("Act"), 23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated analysis.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in

the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

Instantly, the relevant provisions of the Act are as follows:

**(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1)  The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

. . .

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

. . .

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions

described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A § 2511(a)(1), (8), (b).

Parental rights may be terminated pursuant to Section 2511(a)(1) "if the parent either demonstrates a settled purpose of relinquishing parental claim to a child *or* fails to perform parental duties." *In re C.M.S.*, 832 A.2d 457, 462 (Pa. Super. 2003) (emphasis in original) (citation omitted). Our Supreme Court has held that

> [o]nce the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*In re Adoption of Charles E.D.M.*, 708 A.2d 88, 92 (Pa. 1988). Further,

> the trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his or her parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

*In re N.M.B.*, 856 A.2d 847, 854-855 (Pa. Super. 2004) (citations omitted).

The following factors must be demonstrated when seeking termination under Section 2511(a)(8):

> (1) the child has been removed from parental care for 12 months or more from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1275–1276 (Pa. Super. 2003) (citation omitted). *See also* 23 Pa.C.S.A. § 2511(a)(8).

"Section 2511(a)(8) sets a 12-month time frame for a parent to remedy the conditions that led to the children's removal by the court." *In re A.R.*, 837 A.2d 560, 564 (Pa. Super. 2003). Once the twelve-month period has been established, the court must next determine whether the conditions that led to the child's removal continue to exist, despite the reasonable good faith efforts of the agency supplied over a realistic period. *See id*. "[T]he relevant inquiry in this regard is whether the conditions that led to removal have been remedied and thus whether reunification of parent and child is imminent at the time of the hearing." *In re I.J.*, 972 A.2d 5, 11 (Pa. Super. 2009) (citations omitted). This Court has acknowledged that

> the application of Section (a)(8) may seem harsh when the parent has begun to make progress toward resolving the problems that had led to removal of her children. By allowing for termination when the conditions that led to removal continue to exist after a year, the statute implicitly recognizes that a child's life cannot be held in abeyance while the parent is unable to perform the actions necessary to assume parenting responsibilities. This Court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future.

*In re J.F.M.*, 71 A.3d 989, 997 (Pa. Super. 2013) (quoting *I.J.*, 972 A.2d at 11–12).

With respect to the "needs and welfare" analysis pertinent to subsections (a)(8) and (b), we have observed:

[I]nitially, the focus in terminating parental rights is on the parent, under Section 2511(a), whereas the focus in Section 2511(b) is on the child. However, Section 2511(a)(8) explicitly requires an evaluation of the "needs and welfare of the child" prior to proceeding to Section 2511(b), which focuses on the "developmental, physical and emotional needs and welfare of the child." Thus, the analysis under Section 2511(a)(8) accounts for the needs of the child in addition to the behavior of the parent. Moreover, only if a court determines that the parent's conduct warrants termination of his or her parental rights, pursuant to Section 2511(a), does a court "engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child." Accordingly, while both Section 2511(a)(8) and Section 2511(b) direct us to evaluate the "needs and welfare of the child," we are required to resolve the analysis relative to Section 2511(a)(8), prior to addressing the "needs and welfare" of [the child], as proscribed by Section 2511(b); as such, they are distinct in that we must address Section 2511(a) before reaching Section 2511(b).

*In re Adoption of C.L.G.*, 956 A.2d 999, 1008–1009 (Pa. Super. 2008) (*en banc*) (citations omitted). "Section 2511(a)(8) does not require an evaluation of the remedial efforts of either the parent or [the agency]." *In re B.C.*, 36 A.3d 601, 611 (Pa. Super. 2012) (citing *C.L.G.*, 956 A.2d at 1007).

Finally, this Court has explained the requisite analysis under Section 2511(b) as follows:

Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that

bond. *Id*. However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008). Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. *Id*. at 63.

*In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010).

In this case, the orphans' court concluded that Mother did not fail to perform her parental duties under Section 2511(a)(1). It explained as follows:

> Given Mother's not insignificant substance abuse history, which has led to periods of incarceration and rehabilitation, and the undisputed testimony that Mother has either complied with or was physically unable to comply with all tasks enumerated under A.O.'s court-approved permanency plan, we found that Mother had insufficient time to correct the problems leading to the child's removal.

Trial Court Opinion, 4/6/16, at 5.

With respect to Section 2511(a)(8), the court explained as follows.

> [The Agency] failed to prove that "the conditions which led to the removal or placement of [A.O.] continue to exist." [The Agency] caseworkers testified that Mother's drug abuse and, specifically, the incident on May 31, 2014 that led to Mother's incarceration, necessitated A.O.'s current placement in foster care. They failed to show, however, that these circumstances continue to exist. While Mother may struggle with addiction for the rest of her life, the testimony showed that, since her incarceration began nearly two years ago, she has taken advantage of the opportunities afforded to her to improve the parent-child relationship. Though Mother may not yet be prepared or even equipped to assume all parental caretaking of A.O., we cannot involuntarily terminate her parental rights on this ground alone.

*Id*. at 6.

In its first, second, fifth, and sixth issues, the Agency argues that the orphans' court erred in denying its petition for the involuntary termination of Mother's parental rights because it denies A.O. permanency. Specifically, the Agency argues that Mother has had repeated periods of drug relapse and incarceration during A.O.'s life, which has resulted in the child being adjudicated dependent on three separate occasions and being in placement for half of her life. Further, the Agency argues that A.O. is in foster care with a pre-adoptive family. For the following reasons, we hold that the orphans' court abused its discretion in concluding that Mother's conduct did not warrant termination of her parental rights pursuant to Section 2511(a)(1) and (8).

Ms. Robinson, the Agency caseworker from May 2014 until October 2015, testified that, during A.O.'s three dependencies, Mother's Family Service Plan ("FSP") objectives remained consistently to (1) obtain mental health treatment; (2) attend drug and alcohol counseling; and (3) participate in parenting classes. **See** N.T., 1/26/16, at 20, 21-22, 36-39. Ms. Robinson testified that Mother participated in the services requested by the Agency and/or ordered by the court since A.O.'s first dependency in January 2011. **See id**. at 39-41. By the time of Mother's arrest on May 31, 2014, for possession of heroin, she had participated in four separate rehabilitation programs. **See id**. at 41. She testified on cross-examination as follows:

Q. So would it be fair to say that [M]other has trouble . . . staying drug and/or alcohol free without having to attend some type of court-ordered program?

. . .

A. I would find that fair to say. The few times that, you know, [Mother] has had the child and, . . . that we haven't had dependency of the child, was when she was under supervision of the criminal justice system or incarcerated.

*Id*. at 41-42. Indeed, Ms. Robinson testified on direct examination:

Q. So when we're talking about compliance and progress, does [M]other have more of an issue complying with the request that you lay out for her or making progress based on compliance?

A. Making progress and keeping it, so to say.

*Id*. at 22.

Like Ms. Robinson, Ms. Ganczarski, the Agency caseworker from October 2015 through the time of the hearing, testified that Mother has had "the same consistent tasks" in her FSP plan over the years of A.O.'s dependencies. *Id*. at 61. She testified, in part, that Mother has been "through multiple rehab facilities. . . . So she has been through numerous providers, and we do still have the concern for [M]other's ability to maintain [sobriety]. She has not shown a history of being able to maintain stability, both with the mental health or with the drug and alcohol treatments." *Id*.

Ms. Ganczarski testified that Mother contacted her shortly after her release from prison on November 18, 2015. They met on November 24, 2015, at which time they reviewed Mother's FSP objectives. *See id*. at 55. By the time of the hearing, she rated Mother's compliance as moderate, but

her progress as minimal because she could not "rate if [Mother is] able to maintain the sobriety and stability long-term." *Id*. at 59. Importantly, Ms. Ganczarski testified that Mother is on parole until May 2020.[2] *Id*. at 60. She testified as follows:

> Q. Do you believe that the minor child can safely be returned home with [M]other at this point?
>
> A. No, I do not believe she can be safely returned at this point. Mother has not . . . consistently been able to show that she can maintain her mental health or sobriety on a long-term basis. Mother . . ., while she's either incarcerated or under the supervision of parole or probation, she's been able to . . . maintain sobriety, however, when she is not, it is when the concerns arise. So I would need to be able to see that [M]other is able to maintain long-term before the child can safely be back with [her].

*Id*. at 59-60.

Ms. Ganczarski testified that A.O. began visiting with Mother in October 2015, for a total of three visits before Mother was released from prison.[3] *See id*. at 65. She testified that Mother has also had three supervised visits since her release from prison. *See id*. at 64. Although Ms. Ganczarski did not supervise any of the visits between Mother and A.O., she

---

[2] Ms. Ganczarski testified that Mother meets weekly with her parole officer, maintains a curfew, and has had negative drug screens conducted by the parole officer. *See* N.T., Hearing, 1/26/16, at 60.

[3] Ms. Ganczarski implied in her testimony that visitation was not permitted between Mother and A.O. for an unspecified time-period because of Mother's conviction on charges for child endangerment stemming from the May 31, 2014 incident. *See id*. at 65-66.

testified that, to her knowledge, Mother has acted appropriately during the visits, and that "[t]here [were] no reports of fear between child and mother." *Id*. at 66-67. In addition, Ms. Ganczarski testified that Mother has been cooperative during her interactions with her. *See id*. at 67.

Ms. Ganczarski testified that A.O. has been in the same foster home for twenty consecutive months at the time of the termination hearing, where she had also resided during her prior placement, which was for sixteen consecutive months. *See id*. at 68. Ms. Ganczarski testified that she has observed A.O. in the foster home since June 2015. *See id*. at 69-70. She testified that A.O. is bonded to her foster family, and that she refers "to foster mom as her mother." *Id*. at 69.

Based on the foregoing testimonial evidence, we conclude that the orphans' court abused its discretion in determining that Mother's conduct did not warrant termination under Section 2511(a)(1) for failure to perform her parental duties. In concluding that "Mother had insufficient time to correct the problems leading to the child's removal[,]" the court patently failed to consider the *entire* history of this case. The evidence demonstrated that Mother had the same FSP objectives for half of A.O.'s life, for a total of 37 months, and maintained sobriety only when incarcerated or under supervision by the criminal justice system.

Likewise, we conclude that the court abused its discretion in failing to terminate Mother's parental rights pursuant to Section 2511(a)(8). By the

time of the hearing, A.O. had been in placement for twenty consecutive months, which was far in excess of the statutory minimum. Because of Mother's significant drug addiction history, reunification between Mother and A.O. was not imminent at the time of the hearing. Therefore, the conditions that led to A.O.'s placement continued to exist. Finally, the testimonial evidence overwhelmingly demonstrates that involuntarily terminating Mother's parental rights would best serve the needs and welfare of A.O. by providing her with permanence and stability in the home of her foster parents, who are a pre-adoptive resource. **See** N.T., Hearing, 1/26/16, at 17. Although the evidence revealed that Mother has been cooperative with the Agency since her release from prison and that she has been complying with her FSP and parole requirements, we "cannot and will not subordinate indefinitely [A.O.]'s need for permanence and stability to [Mother]'s claims of progress and hope for the future." **In re J.F.M.**, **supra**.

Accordingly, we reverse the subject order insofar as it denied the Agency's petition for the involuntary termination of Mother's parental rights pursuant to 23 Pa.C.S.A § 2511(a)(1) and (8).[4] We remand this matter to the orphans' court to consider, in timely fashion, A.O.'s "developmental, physical and emotional needs and welfare" pursuant to 23 Pa.C.S.A §

---

[4] Based on this disposition, we need not consider the Agency's remaining issues on appeal.

2511(b) and pertinent case[5] authority.[6] Thereafter, the court shall promptly enter a new order regarding the involuntary termination of Mother's parental rights and Father's consent to adoption.

Order reversed. Case remanded for further proceedings. Jurisdiction relinquished.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/9/2016

---

[5] *See*, *e.g.*, *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) ("[I]f the grounds for termination under subsection (a) are met, a court 'shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.' 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include '[i]ntangibles such as love, comfort, security, and stability.' *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M.*, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's 'needs and welfare' requires consideration of the emotional bonds between the parent and child. The 'utmost attention' should be paid to discerning the effect on the child of permanently severing the parental bond.")

[6] Ms. Ganczarski, an Agency caseworker, testified that A.O. is bonded with her foster family, stating, "[s]he appears to be a part of the family and to have a good connection and to be very stable and happy and safe in their environment." N.T., Hearing, 1/26/16, at 69.

- 16 -